**Case No. 24-4291**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

JOHN WOOLARD; BREANNA WOOLARD; HECTOR GONZALES;
DIANA GONZALES; CARRIE DODSON,
*Plaintiffs-Appellants,*

v.

TONY THURMOND; MICHAEL COLEMAN; KRISTIN BLANCO;
BARRY LINDAMAN; BREANN MORSE; TED DESTRAMPE;
RENE ADAMO; MELISSA BASSANELLI; ZIMA CREASON; PAM COSTA;
SAUL HERNANDEZ; BEN AVEY; PAULA VILLESCAZ;
TANYA KRAVCHUK; BLUE RIDGE ACADEMY; SAMANTHA HAYNES;
JESSIE MARON; VISIONS IN EDUCATION CHARTER SCHOOL;
BRIAN ALBRIGHT; STEVE OLMOS; JENNIFER MORRISON;
MICAH STUDER; MARK HOLMAN; LISA SOPHOS,
*Defendants-Appellees.*

_____

*On Appeal from the United States District Court for Eastern District of California (Sacramento),
Case No. 2:23-cv-02305-JAM-JDP • The Honorable John A. Mendez, District Judge*

**BRIEF OF *AMICI CURIAE* NATIONAL ALLIANCE FOR PUBLIC CHARTER SCHOOLS;
CALIFORNIA CHARTER SCHOOLS ASSOCIATION; ASSOCIATION OF PERSONALIZED
LEARNING SCHOOLS & SERVICES; AND CHARTER SCHOOLS DEVELOPMENT CENTER
OPPOSING PLAINTIFFS-APPELLANTS' PETITION FOR REHEARING *EN BANC***

CHRISTOPHER A. BROOK
**PATTERSON HARKAVY LLP**
100 Europa Drive, Suite 420, Chapel Hill, North Carolina 27517
Telephone: (919) 942-5200 • Facsimile: (866) 397-8671
cbrook@pathlaw.com

*Counsel for Amici Curiae National Alliance for Public Charter Schools;
California Charter Schools Association; Association of Personalized Learning
Schools & Services; and Charter Schools Development Center*

 

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* National Alliance for Public Charter Schools, California Charter Schools Association, Association of Personalized Learning Schools & Services, and Charter Schools Development Center certify that they have no parent corporation or stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICI CURIAE* ...........................................................1

ARGUMENT ..................................................................................2

    I.    Charter Schools and Their Independent Study Programs are Part of the California Public School System ........................................2

    II.   Plaintiffs Overlook Key Distinctions Between the Independent Study Regime and Recent Free Exercise Case Law ...............................................................................7

    III.  Plaintiffs Argue to Upend the Independent Study Regime, with Broader Implications for Public Education and Charter Public Schools ......................................................................12

          A.   Implications for Independent Study Regime ............................12

          B.   Implications for Public Education More Broadly and Charter Schools Particularly ......................................15

CONCLUSION ..............................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Carson v. Makin,*
    596 U.S. 767 (2022) ..................................................................... *passim*

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020) ...................................................................7, 8, 11

*Lee v. Weisman,*
    505 U.S. 577 (1992) ................................................................ 17, 18

*Loffman v. Cal. Dept. of Educ.,*
    119 F.4th 1147 (9th Cir. 2024).............................................................11

*M.L. v. Smith,*
    867 F.3d 487 (4th Cir. 2017).............................................................15

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025) ...........................................................................13

*Okla. Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma,*
    605 U.S. 165 (2025) ................................................................... 7, 15

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.,*
    450 U.S. 707 (1981) .............................................................................17

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ...................................................................7, 8, 11

*Wilson v. State Bd. of Educ.,*
    75 Cal. App. 4th 1125 (1999) ...............................................................3

*Zelman v. Simmons-Harris,*
    536 U.S. 639 (2002) ...........................................................................11

**Statutes:**

Cal. Educ. Code § 220 .....................................................................3

Cal. Educ. Code § 11700(b)(1) ......................................................12

Cal. Educ. Code § 33190 .................................................................7

Cal. Educ. Code § 42238.02 ...........................................................4

iii

Cal. Educ. Code § 47601 ..................................................................18

Cal. Educ. Code § 47601(c).............................................................16

Cal. Educ. Code § 47601(g)...............................................................4

Cal. Educ. Code § 47602 ..................................................................18

Cal. Educ. Code § 47605(d)(1) .................................................... 5, 10

Cal. Educ. Code § 47605(d)(2).........................................................16

Cal. Educ. Code § 47605(e)................................................................4

Cal. Educ. Code § 47605(e)(1) ..................................................... 3, 10

Cal. Educ. Code § 47605(e)(2)(A)................................................ 3, 10

Cal. Educ. Code § 47605(l)(1) ................................................. 4, 5, 10

Cal. Educ. Code § 47607(f)(4)..........................................................18

Cal. Educ. Code § 47612.5(a)(3) .................................................. 5, 10

Cal. Educ. Code § 51220 ..................................................................16

Cal. Educ. Code § 51744(a)..............................................................16

Cal. Educ. Code § 51744(b)................................................................4

Cal. Educ. Code § 51745(a)................................................................6

Cal. Educ. Code § 51747 ....................................................................4

Cal. Educ. Code § 51747(g)................................................................6

Cal. Educ. Code § 51747(g)(8)...........................................................6

Cal. Educ. Code § 51747(g)(9)(A)(i)..................................................6

Cal. Educ. Code § 51747.3(a)............................................................5

Cal. Educ. Code § 51749.5(a)(3) .................................................. 5, 13

Cal. Educ. Code § 51749.5(a)(4)(A)...................................................5

Cal. Educ. Code § 51749.5(a)(8)(A)............................................. 6, 13

Cal. Educ. Code § 51749.5(a)(8)(ii)....................................................6

Cal. Educ. Code § 51749.5(a)(8)(iii)...................................................6

Cal. Educ. Code § 51749.5(a)(8)(iv) ..................................................6

Cal. Educ. Code § 52060(d)(3) ...................................................................16

Cal. Educ. Code § 60602.5 ................................................................... 5, 14

Cal. Educ. Code § 60640 ...................................................................... 5, 14

Cal. Educ. Code § 60640(b)(1)(A) ...........................................................14

Cal. Educ. Code § 60640(b)(2)(A) ...........................................................14

**Constitutional Authority:**

Cal. Const. Art. IX, § 8 ....................................................................... 3, 13

**Rules:**

Fed. R. Civ. P. 12(b)(6) ..............................................................................3

**Regulations:**

5 C.C.R. § 11700(b)(1) ......................................................................... 6, 12

5 C.C.R. § 11701.5(a) ................................................................................5

5 C.C.R. § 11702(b) ....................................................................... 5, 10, 12

**Other Authorities:**

*Genesis* 1:1-:31 .......................................................................................14

James Wood, *The Great Dissembler*, 20 London Review of Books 8
   (Apr. 16, 1998)................................................................... 13, 14

Me. Rev. Stat. Ann. Tit. 20-A, § 6209 ......................................................9

NASA, *Cosmic History* ..........................................................................14

# INTEREST OF *AMICI CURIAE*[1]

The National Alliance for Public Charter Schools ("NAPCS") is the leading national organization committed to supporting students attending or hoping to attend a charter public school. The California Charter Schools Association ("CCSA") advocates for charter public schools and shares their successes with other public schools in the state. The Association of Personalized Learning Schools & Services ("APLUS+") advances Flex-Based Personalized Learning instruction across California—which includes at-home independent study choices. The Charter School Development Center ("CSDC") advocates for and provides leadership training and technical support to member schools in California.

NAPCS, CCSA, APLUS+, and CSDC submit this brief as *amici curiae* supporting Defendants. Charter public schools are committed to innovative educational solutions that serve students from all backgrounds. But that is only possible in appropriately focused school environments. This brief expounds on the role played by charter public schools and independent study programs in the California public school system. It also underlines how a ruling for Plaintiffs would harm education.

---

[1] All parties consent to this brief's filing, which was not authored by a party or counsel to a party. No person other than *amici*, its members, and its counsel contributed money that was intended to fund preparing or submitting this brief.

# ARGUMENT

Plaintiffs conjure a California independent study regime that is nothing like the program the state created and supervises. They do so in an attempt to shoehorn this part of the public educational system into free exercise jurisprudence that explicitly disclaims being applicable to public schooling.

The panel rightly and unanimously rejected this effort. Plaintiffs seek to stand the program and governing law at issue on its head—with grave implications for religious liberty and public education, especially charter public schools. *En banc* review is unwarranted.

## I. Charter Schools and Their Independent Study Programs are Part of the California Public School System.

Charter schools, including those with independent study programs, are public schools. Plaintiffs and their supportive *amici* resist this reality at every turn, presenting these schools and programs as public in name only. This is wrong.

In Plaintiffs' and their supporters' telling, the schools and programs at issue are little more than laissez faire "grant programs," Brief of Plaintiffs-Appellants at 36, No. 42-4291 (9th Cir. appeal docketed July 12, 2024) [hereinafter "Br. of Pls."], designed to make private schooling "more affordable for all." Brief of Liberty Justice Center in Support of Plaintiffs-Appellants at 10, No. 42-4291 (9th Cir. appeal docketed July 12, 2024). Parents use state funds "to select whatever [curricular] materials they prefer." Plaintiffs' Opposition to Defendants Blue Ridge, *et al.* Motion

2

to Dismiss Pursuant to FRCP 12(b)(6) at 1, No. 2:23-CV-02305 (E.D. Cal. docketed Oct. 11, 2023) [hereinafter "Pls. MTD Opp."]. No questions asked so long as the "parents' educational choices . . . are secular." Br. of Pls. at 46. Plaintiffs likewise argue there is no meaningful oversight provided during these programs—dismissing charter schools' independent study instructors as "so-called 'Home School Teachers,'" with mere box-checking responsibilities. Pls. MTD Opp. at 3. Based on this depiction, Plaintiffs conclude the "education that students receive . . . is not, in substance, public." Br. of Pls. at 54.

As the panel recognized, these self-serving characterizations do not comport with reality. Opp.9-14. To start, California "charter schools *are* public schools because . . . [they] are part of the public school system." *Wilson v. State Bd. of Educ.*, 75 Cal. App. 4th 1125, 1139 (1999) (emphasis in original). Indeed, they "are *strictly* creatures of statute." *Id.* at 1135 (emphasis in original).

This is not semantics or a legal fiction but a core component of California charter schools. They "shall admit all pupils who wish to attend." Cal. Educ. Code § 47605(e)(2)(A). They cannot discriminate on the basis of "disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, [or] sexual orientation." *Id.* at §§ 220, 47605(e)(1). Related to this, and like other public schools, charter schools are strictly non-religious. Cal. Const. Art. IX, § 8, Cal. Educ. Code § 47605(e)(1); *see also Carson v. Makin*, 596 U.S. 767, 803 (2022) (Breyer, J.,

dissenting) (stressing religious schools can discriminate in admissions based on "gender-identity, sexual orientation, and religion").

Zooming out beyond the student body confirms the public nature of California charter schools. They are free to attend, receiving funds through the same process as traditional public schools. Cal. Educ. Code §§ 42238.02, 47605(e). And their teachers must hold the same credentials as traditional public school teachers. *Id.* at § 47605(l)(1).

Yes, California designed charter schools to bring new ideas to the table. But they were designed to invigorate public education, not serve as publicly-funded, unregulated private schools. *See, e.g.*, *id.* at § 47601(g) (creating charter schools to "[p]rovide vigorous competition within the public school system to stimulate continual improvement in all public schools").

The same is true of independent studies. Such programs—whether associated with traditional or charter public schools, *id.* at § 51747—are also designed to promote innovation, offering "programs that best serve the needs of their pupils," *id.* at § 51744(b).

But it does not follow that public school officials rubber stamp private educational choices in these programs—instead, they are public at every step. First, independent study programs must meet the same general standards as traditional public schools. They are required "to be substantially equivalent in quality and in

quantity to [traditional] classroom instruction" to ensure that pupils will complete the "course of study within the customary time frame." 5 C.C.R. § 11701.5(a). To this end, "[t]he curriculum and methods of study" employed in independent studies "shall be consistent" with those of the associated public school system. *Id.* at § 11702(b).

These requirements are not left to chance. "Courses are annually certified . . . to be . . . substantially equivalent to . . . classroom-based courses" in "rigor, educational quality, and intellectual challenge." Cal. Educ. Code § 51749.5(a)(4)(A). This ensures that independent study students are prepared for requisite annual pupil assessments. *Id.* at §§ 47605(d)(1), 47612.5(a)(3), 60640. These assessments measure teacher and pupil performance in English language arts, mathematics, and science, with the aim of improving teaching and learning. *Id.* at §§ 60602.5, 60640.

Second, schools with independent studies ensure these standards are met. This starts with an agreement for each student covering, *inter alia*, the "objectives and methods of study for the pupil's work," the "manner, time, frequency, and place for submitting a pupil's assignments," and how many missed assignments trigger evaluation of whether "the pupil should . . . continue in independent study." *Id.* at 51747(g). Students are then paired with a credentialed teacher, *id*. at 47605(l)(1), who often holds a "subject matter-[appropriate] credential." *Id.* at § 51749.5(a)(3). Using the schools' instructional planning funds, *id.* at § 51747.3(a) (prohibiting

public schools transferring funds to parents of independent study pupils), "teachers select and approve curriculum, tutoring services, technology items, and enrichment classes to fit each student's goals," ER-80; *see also* 5 C.C.R. § 11700(b)(1) (requiring supervising teacher oversee "allocation of resources" as well as "study design" and "implementation"). With this foundation in place, the supervising teacher evaluates whether the pupil is making "satisfactory educational progress." Cal. Educ. Code § 51749.5(a)(8)(A). This includes monitoring whether she is completing assignments, "[l]earning required concepts," and "[p]rogressing toward successful completion of the course of study." *Id.* at § 51749.5(a)(8)(ii)-(iv).

A final point: parents of independent study children know these programs are part of and choose for their children to receive an education within the public school system. Again, independent studies begin with written agreements laying out their terms and public school's oversight of them. *Id.* at § 51747(g). These agreements are signed by the pupil and her caregiver and confirm that the program "is an optional educational alternative in which no pupil [is] required to participate." *Id.* at § 51747(g)(8), (g)(9)(A)(i).

Nor is this new. The contours of these programs have been in place for nearly 35 years. *Id.* at § 51745(a) ("Commencing with the 1990-91 school year, a local educational agency may offer independent study . . . in accordance with the

requirements of this article."). With all this well established, Plaintiffs "elected to enroll their students in" this form of public education. 1-ER-11.[2]

Plaintiffs set a straw man ablaze, attempting to transform a public educational program featuring robust state input and oversight into laissez faire grant programs. The facts, however, tell a different story.

## II.  Plaintiffs Overlook Key Distinctions Between the Independent Study Regime and Recent Free Exercise Case Law.

Plaintiffs re-imagine charter public schools and their independent study regimes in an effort to align them with the programs at issue in *Trinity Lutheran*, *Espinoza*, and *Carson*. But differences jump off the page. And these differences are consequential—the Supreme Court has stated states do not violate free exercise rights simply by running their public education system and choosing not to subsidize private religious education.

In the words of their author, Chief Justice John Roberts, *Trinity Lutheran*, *Espinoza*, and *Carson* each "involved fairly discrete state involvement" in public benefit programs. Tr. Oral Arg. at 15 (Roberts, C.J.), *Okla. Statewide Charter Sch. Bd. v. Drummond ex rel. Oklahoma*, 605 U.S. 165 (2025) (No. 24-394) (mem.) [hereinafter "Chief Justice Roberts in *Drummond*"]. In *Trinity Lutheran Church of*

---

[2] At the same time, parents can homeschool their children. Cal. Educ. Code § 33190. Unlike independent studies, homeschools "are subject to none of [the aforementioned] requirements." Op.13.

*Columbia, Inc. v. Comer*, 582 U.S. 449, 453 (2017), Missouri "offer[ed] state grants to help public and private schools, nonprofit day care centers, and other nonprofit entities purchase rubber playground surfaces from recycled tires." Religious organizations were excluded from these grants. *Id.* at 454. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 467-68 (2020), involved a Montana program "to provide tuition assistance to parents who send their children to private schools." The Montana Supreme Court held this violated the state constitution by providing aid to religious schools. *Id.* at 468. Similarly, *Carson*, 596 U.S. at 771-72, involved Maine's limitation of "a program of tuition assistance for parents who live in school districts that do not operate a secondary school of their own" to non-religious private schools. In each instance, conditioning access to the program on an entity's religious character violated the Free Exercise Clause. *Id.* at 779-80.

Just as they were clear about what they were about, these cases were clear about what they were not about—any requirement that states "subsidize private education"—religious or otherwise. *Espinoza*, 591 U.S. at 487. As the panel appreciated, *Carson* is particularly instructive. Opp.11-12. Responding to Maine's argument that their program offered "a free public education," and, hence, did not raise free exercise issues, *Carson*, 596 U.S. at 782 (quoting Brief for Respondent at 1-2), the Court accepted the legal premise. States can constitutionally "provide a strictly secular education in [their] public schools." *Id.* at 785. What the Court

8

rejected was the proposition that Maine offered "'a free public education'" through its program—retorting that the authorizing "statute does not say anything like that." *Id.* at 782 (quoting Brief for Respondent at 1-2). The benefit was instead "*tuition* at a public *or* private school, selected by the parent, with no suggestion that the 'private school' must somehow provide a 'public' education." *Id.* at 782-83 (emphasis in original).

The program's operation made that plain. First, private schools selected by parents did "not have to accept all students." *Id.* at 783. For example, "the free public education that Maine insist[ed] it [was] providing through the tuition assistance program [was] often *not* free" as private schools charged more than the benefit. *Id.* (emphasis in original). Participating schools also did not need to hire state-certified teachers. *Id.* at 784. And, where Maine public schools had to "abide by certain 'parameters for essential instruction in English language arts; mathematics; science and technology; social studies; career and education development; visual and performing arts; health physical education and wellness; and world languages[,]'" private voucher-eligible schools were "exempt from these requirements." *Id.* at 783 (quoting Me. Rev. Stat. Ann. Tit. 20-A, § 6209). These schools also did not have to "administer the annual state assessment in English language arts, mathematics, and science" as public schools were required to do. *Id.* at 783-84. "In short, it [was] simply not the case that . . . schools . . . eligible for state funds . . . [had to] offer an

9

education . . . equivalent—roughly or otherwise—to that available in the Maine public schools." *Id.* at 784. The overlap was much narrower: public and voucher-eligible private schools "must both be secular." *Id.*[3]

The distinctions between the California charter school and independent study regimes and the monetary grants in *Carson* are "numerous and important." *Id.* at 783. Where the tuition benefit in *Carson* did not guarantee a free education to all, a hallmark of public education, *id.*, California charter public schools are free and open to every student. Cal. Educ. Code § 47605(e)(1)-(2)(A). Where schools receiving the benefit in *Carson* did not have to hire state-certified teachers, 596 U.S. at 784, California charter public schools and their independent study programs must. Cal. Educ. Code §§ 47605(1)(1). Where schools receiving the benefit in *Carson* did not have to follow the public schools' instructional parameters or administer state assessments, 596 U.S. at 783, California charter public schools and independent study programs must do both. Cal. Educ. Code §§ 47605(d)(1), 47612.5(a)(3); 5 C.C.R. § 11702(b). And, where public funds supported religious practice "***wholly*** as

---

[3] Recognizing its danger to their argument, *amici* Religious Freedom Institute audaciously insist that *Carson* says nothing about "what constitutes public schooling." Brief of Religious Freeman Institute Supporting Petition for Rehearing *En Banc* at 11, No. 42-4291 (9th Cir. appeal docketed July 12, 2024). But *Carson* did precisely that—reviewing features common to public schools to show that some "recipients of Maine tuition assistance payments . . . are not public schools." 596 U.S. at 785.

a result of [parents'] own genuine and independent private choice" in *Carson*, 596 U.S. at 775 (quoting *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002)) (emphasis added), Plaintiffs cannot and do not exercise commensurate control, *supra* Part I. To suggest—as Plaintiffs repeatedly do, *see, e.g.*, Br. of Pls. at 46—that all that connects traditional public schools with charter public schools and their independent study programs is "that they must both be secular," *Carson*, 596 U.S. at 784, is wrong, Op.11-12 ("The independent study programs . . . share the features of public education that the Court emphasized in *Carson*.").

Though Plaintiffs attempt to recast California's charter public schools and independent studies into grant programs "materially indistinguishable" from those in *Trinity Lutheran*, *Espinoza*, and *Carson*, Pls. MTD Opp. at 6, their efforts fail, Opp.9-14; *see also Loffman v. Cal. Dept. of Educ.*, 119 F.4th 1147, 1169 (9th Cir. 2024) (underlining case did not involve "benefits . . . earmarked solely for students" educated in public schools) (cleaned up). The distinction between these respective programs underline that California is not choosing to "subsidize private education" through its charter public schools and independent study programs. *Espinoza*, 591 U.S. at 487. The State instead is making its best effort to run a public school system accessible and responsive to all.

## III. Plaintiffs Argue to Upend the Independent Study Regime, with Broader Implications for Public Education and Charter Public Schools.

If accepted, Plaintiffs' arguments would upend California's independent study regime and render it unworkable. And the logic of Plaintiffs' arguments is not easily cabined—it would have sweeping implications for public education and public support for private education. Adopting these arguments would harm both religious and public education, with particular consequences for charter public schools.

### A. Implications for Independent Study Regime

Plaintiffs argue for parents to receive no-strings-attached aid to establish curricula of their choice. *See, e.g.*, Br. of Pls. at 58. In essence, they seek to create private schools operating within public schools.

These arguments are at odds at every turn with the independent study regime California has created. As outlined above, curricula employed in independent study programs are consistent with that in the associated public school system. 5 C.C.R. § 11702(b). Obviously, if Plaintiffs have an unqualified right to "curriculum of their choice," Br. of Pls. at 37, then that consistency disappears. And, if parents have unfettered discretion over curricular choices, then it follows that they have absolute freedom in directing state funds to the materials they believe support their chosen curricula. *But see* Cal. Educ. Code § 11700(b)(1) (requiring supervising teacher oversee "allocation of resources" as well "study design" and "implementation"). This is not just overriding considered legislative choices; it is contrary to the concept

12

of public schooling. *See Mahmoud v. Taylor*, 606 U.S. 522, 568 (2025) (disavowing parental "right to micromanage . . . public school curriculum").

Relatedly, Plaintiffs' arguments raise questions about how independent studies would operate if they prevail. One of the Plaintiffs wants his daughter to take a course in "church history." 3-ER-485 ¶ 56. If parents are able to so dictate the classes their children take, teachers supervising independent study courses may no longer "hold the appropriate subject matter credential," Cal. Educ. Code § 51749.5(a)(3), as, for instance, most California public schools do not have teachers trained in church history. *See* Cal. Const. Art. IX, § 8 (prohibiting religious charter public schools). Do schools hire credentialed teachers in bespoke subject matter areas or do credentialed teachers disappear?

Let's say California chooses to hire credentialed teachers. Given parental curricular control, how does a credentialed teacher in church history ensure a student is making "satisfactory educational progress?" Cal. Educ. Code § 51749.5(a)(8)(A). Take English statesman and theologian Sir Thomas More as an example. If a parent teaches and a student retains that More is a saint and martyr who "died opposing Henry VIII's . . . robbery from the Pope of the leadership of the English Church," James Wood, *The Great Dissembler*, 20 London Review of Books 8 (Apr. 16, 1998), is that satisfactory progress? Or must the teacher also insist parents teach that some regard More's critiques of early Protestantism as "incoherent and frantic?" *Id.*

Godspeed to the teacher navigating this dispute, which cost More his head and has divided scholars for over 600 years. *Id.* Or, instead, does the teacher just acquiesce to whatever, if anything, the parent thinks their child needs to know about this crossroads in church history? If so, why even have a teacher supervise?

And how will California know how this experiment is working? It currently measures progress via annual student testing. Cal. Educ. Code §§ 60602.5, 60640. Pursuant to standards adopted by the State Board of Education, California tests on English and mathematics in grades three through eight and eleven and on science in grades five, eight, and ten. *Id.* at 60640(b)(1)(A), (2)(A). If parents have curricular control and focus their eighth-grade instruction on church history, then the value of testing on English, math, and science diminishes. In response, do these assessments (somehow) become as bespoke as the instruction? Questions remain even if certain baselines are adhered to. For instance, how will California measure progress in areas where science teaches one explanation and faith another? *Compare* NASA, *Cosmic History*, https://science.nasa.gov/universe/overview/#bigbang (last visited Nov. 22, 2025) (describing creation of universe as process unfolding over billions of years) *with Genesis* 1:1-:31 (describing God's creation of heaven, earth, and man over six days).

This is not a program involving easily manageable, "discrete state involvement;" as Chief Justice Roberts recognized, the State has "a much more

14

comprehensive involvement" in public education. Chief Justice Roberts in *Drummond,* at 16. At present, the public nature of California's independent study program ensures students learn a consistent curriculum supported and overseen by a trained teacher. Progress is then assessed by testing core components of the curriculum. All of this comes into question should Plaintiffs prevail.

### B. Implications for Public Education More Broadly and Charter Schools Particularly

While independent study programs provide a useful window into the problems with Plaintiffs' arguments, they are just the tip of the iceberg. Accepting their arguments, among other things, would require religious instruction in traditional public school classrooms. This would pose myriad challenges, most especially for charter public schools.

If public education is indistinguishable from playground or tuition grants, Pls. MTD Opp. at 6, then any limitation on religious participation is suspect. *Carson*, 596 U.S. at 780-81. This would mean mandatory religious instruction within all public schools nationwide for any family wanting it. *See* Brief of Alliance Defending Freedom Supporting Petition for Rehearing *En Banc* at 7, No. 42-4291 (9th Cir. appeal docketed July 12, 2024) ("It matters not whether [the] program is part of public school."); *but see M.L. v. Smith*, 867 F.3d 487, 490-91 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 752 (2018) (rejecting plaintiff argument of entitlement to public school instruction on "laws and customs of Orthodox Judaism").

Plaintiffs do not and cannot meaningfully disavow these sweeping implications. True, they distinguish independent studies from "traditional classroom-based instruction in public schools," on the premise that independent study parents operate from "a curriculum of their choice." Br. of Pls. at 3, 37. But that is not true. *Supra* Part I. And, while charter schools and independent studies offer robust choices and solicit parental input, *see, e.g.*, Cal. Educ. Code §§ 47601(c) (creating charter schools to promote "innovative teaching methods"), 47605(d)(2) ("Charter schools shall . . . consult with their parents [and] legal guardians . . . regarding [their] educational programs."), 51744(a) (creating independent studies designed to offer "range of quality educational options"), these are features shared with traditional classroom-based public instruction, *see, e.g.*, Cal. Educ. Code §§ 51220 (laying out variety of grade 7-12 course offerings), 52060(d)(3) (requiring all public schools "seek parent input in making decisions").

The independent study program example offered above provides a (small) window into the challenges that follow accepting Plaintiffs' arguments. Teaching students how to practice their faith is presently beyond public schools' mission and competence. *Supra* Part III.A. Public schools would have to re-orient their efforts to provide that instruction, with implications for everything from hiring to curricula. And it would be curricula. Religious practices are deeply personal and need not be "logical, consistent, or comprehensible to others . . . to merit First Amendment

protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981). Consequently, learning dogma and then leading religious instruction is no mean feat. Add to that the fact that any teacher knows a classroom is actually many in one, featuring students of different capabilities and learning styles, and the challenge begins to come into focus.

This points to another dilemma schools will have to manage: inevitable disagreements that come with their taking on religious instruction. "Divisiveness . . . can attend any state decision respecting religions." *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *see also Carson*, 596 at 787 (expressing "serious concerns about state entanglement with religion"). *Amicus* supporting Plaintiffs point out this already happens in the current environment in which public education and religion are not entwined. Brief of American Hindu Coalition in Support of Plaintiffs at 4, No. 42-4291 (9th Cir. appeal docketed July 12, 2024) (compiling cases wherein "[p]ublic school administrators . . . misrepresent[ed] and misunderst[oo]d the religious practices and culture of families practicing minority faiths"). Such misunderstandings are as regrettable as they are inevitable. *Thomas*, 450 U.S. at 714 (stressing religious beliefs not always "comprehensible to others"). In a world in which state and religion are entwined, it takes little imagination to envision scenarios in which some parents believe the school is not doing enough in its religious

instruction while others believe that it is subjecting impressionable students from other faith traditions to "subtle coercive pressures" to join in. *Lee*, 505 U.S. at 588.

While all public schools would face challenges managing these new, sensitive responsibilities, they would show up more frequently in and pose greater potential consequences for charter public schools. First, these schools have incredibly diverse student bodies—including when it comes to religious beliefs. Brief of NAPCS, *et al.* in Support of Defendants-Appellees, *et al.*, at 22-23, No. 42-4291 (9th Cir. appeal docketed July 12, 2024). Then there is the matter of what happens when schools fail to live up to parental and student expectations. This will take the form of administrative and fiscal burdens, which, as this case makes plain, include costly litigation. And, unlike traditional public schools, charters face closure if they do not live up to their legal obligations. Cal. Educ. Code § 47607(f)(4). Finally, Plaintiffs' arguments imperil the charter public school movement. States create charter public schools, *see, e.g.*, Cal. Educ. Code §§ 47601-02; they could decide that a public educational space they can no longer supervise and control is not worth having.

## CONCLUSION

Plaintiffs recast the program and the governing law at issue. But the panel was right: California does not violate the First Amendment by providing a secular public education and choosing not to subsidize private religious education. Ruling to the contrary would harm public schools, especially those *amici* represent, as well as those seeking a religious education. *Amici* respectfully ask this Court to deny Plaintiffs' request for *en banc* review.


Dated: November 28, 2025                    Respectfully submitted,

                                            s/ Christopher A. Brook
                                            CHRISTOPHER A. BROOK
                                            PATTERSON HARKAVY LLP
                                            100 Europa Drive, Suite 420
                                            Chapel Hill, NC 27517
                                            Telephone: (919) 942-5200
                                            cbrook@pathlaw.com

                                            *Counsel for* Amici Curiae

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-4291

I am the attorney or self-represented party.

**This brief contains** | 4,199 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⊙ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Christopher A. Brook | **Date** | 11/28/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2025, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

/s/ Christopher A. Brook
Christopher A. Brook
*Counsel for* Amici Curiae